784 So.2d 1151 (2001)
PALM SPRINGS GENERAL HOSPITAL, INC., Appellant,
v.
Amauri VALDES, M.D., Appellee.
Nos. 3D99-1543, 3D99-771.
District Court of Appeal of Florida, Third District.
March 7, 2001.
Rehearing Denied May 30, 2001.
*1152 White & Case and Charles C. Kline and Beth D. Jarrett, Miami, for appellant.
Alice E. Warwick, Miami, for appellee.
Before SCHWARTZ, C.J., and JORGENSON, and FLETCHER, JJ.
Rehearing En Banc Denied May 30, 2001.
FLETCHER, Judge.
Palm Springs General Hospital, Inc. [Hospital] appeals a final judgment entered in an action for damages arising from the denial of staff privileges to Amauri Valdes, M.D. Dr. Valdes cross-appeals a post-trial order reducing the jury award by the amount of a settlement between another defendant and Dr. Valdes. For the reasons which follow, we affirm.
Dr. Valdes first obtained staff privileges in radiology at the Hospital in 1972. Each year thereafter Dr. Valdes routinely reapplied for and was granted reappointment for the following medical staff year.[1] On August 10, 1995, some three months into the 1995-1996 medical staff year to which he had already been reappointed and without any prior written notice of termination, Dr. Valdes was advised that he could no longer provide radiology services at the Hospital and was asked to leave the premises. The reason given by the Hospital for its action was that it had entered into an exclusive contract with a new group of radiologists which did not include Dr. Valdes.
Since the early 1980s, Dr. Valdes had been practicing in partnership with Drs. Kaul and Eisenberg. The new group of radiologists, with which the Hospital allegedly contracted to provide exclusive service after August 10, 1995, consisted of Dr. Valdes' former partners, Drs. Kaul and Eisenberg, and a third physician. According to the Hospital's administrator and its president, their decision to go with the new group was based on the Hospital's need for radiologists with greater experience *1153 in interventional or invasive radiology procedures. However, before effectively terminating Dr. Valdes' privileges and entering into the contract with the new radiology group, the Hospital president had indicated that he wanted Dr. Valdes out because he believed that a missed finding by Dr. Valdes on an X-ray had resulted in the death of a patient.
After unsuccessful attempts to obtain reappointment at the Hospital or to find equivalent employment with another hospital, Dr. Valdes sued the Hospital and his former partners for damages. The claims against the Hospital were based on violation of section 395.0191, Florida Statutes (1995) and the Hospital's own bylaws which require prior written notice, a hearing before the medical staff executive committee, and an appeals process before termination of medical staff privileges by the board of directorsto all of which procedures Dr. Valdes would have been entitled if his termination or the denial of his privileges was predicated upon his ostensible X-ray error.
Dr. Valdes settled the claims against his former partners for $60,000, and the case proceeded to trial only on the claims against the Hospital. The trial lasted five days and included the admission, over objection, of discovery deposition testimony of an expert regarding damages, as well as testimony from Dr. Kaiser, a member of the medical staff executive committee of Jackson Memorial Hospital, who explained the standards required for appointment determinations under the Joint Commission on Accreditation of Healthcare Organizations (JCAHO). The jury returned a verdict in favor of Dr. Valdes in the amount of $168,000. On the Hospital's motion, this amount was subsequently reduced by the $60,000 settlement between Dr. Valdes and his former partners.
On appeal, the Hospital claims various errors in the trial court's denial of its motion for directed verdict and post-trial motion for new trial. The Hospital argues that it was entitled to a directed verdict because Dr. Valdes failed to prove any wrongdoing on the part of the Hospital which led to his damages. As well, the Hospital challenges the admission of the expert testimony on the JCAHO standards and the introduction of the expert discovery deposition at trial. On cross-appeal, Dr. Valdes claims error in the set-off of the amount of the settlement reached between Dr. Valdes and his former partner, arguing that setoffs are not allowed against non-economic damages where the defendants are severally liable.
The Hospital does not dispute that where disciplinary action is taken against a doctor resulting in the suspension of privileges, the doctor is entitled to notice, hearing and due process as set forth in the hospital bylaws and in section 395.0193, Florida Statutes (1995), which entitlements Dr. Valdes was not accorded. The Hospital contends, however, that these procedures are not implicated in the context of a hospital's administrative decision to terminate an exclusive service provider contract and enter into another, as it alleges was the case here. Although we are not prepared to concede that Florida law[2] endorses *1154 this view, the Hospital's argument totally disregards substantial competent evidence which was presented to the jury and which if believed supports Dr. Valdes' claim that the real reason for the decision to terminate him was the Hospital administrator's mistaken notion that a missed finding by Dr. Valdes on an X-ray had resulted in the death of a patient. This evidence created an issue of fact as to the Hospital's motive in terminating Dr. Valdes' privileges which was properly left to the jury for determination. See Lake Hospital & Clinic, Inc. v. Silversmith, 551 So.2d 538 (Fla. 4th DCA 1989) (evidence that privileges were terminated after a physician made deficiencies in hospital's operations publicly known created jury question as to whether hospital officials acted in good faith and without malice in terminating the physician's privileges).
We find no merit to the Hospital's remaining points. As to the JCAHO standards the trial court was within its discretion in admitting the expert testimony after determining that the standards would help the jury understand the Hospital's obligations in dealing with physicians' privileges. See Carida v. Holy Cross Hosp., Inc., 427 So.2d 803 (Fla. 4th DCA 1983) (JCAHO established the procedural requirements to be used by all hospitals). As to the expert deposition testimony it was admissible at trial pursuant to Florida Rule of Civil Procedure 1.390(b) which provides that any expert witness deposition may be used at trial. As to the award of prejudgment interest, the trial court properly awarded Dr. Valdes prejudgment interest from the date of his effective dismissal from the hospital. See Broward County v. Finlayson, 555 So.2d 1211 (Fla. 1990); Ulano v. Anderson, 703 So.2d 1149 (Fla. 3d DCA 1997); Broward County v. Sattler, 400 So.2d 1031 (Fla. 4th DCA 1981).
Finally, we reject Dr. Valdes' contention on cross-appeal that the damages awarded by the jury should not have been set off by the amount of his settlement with his former partners. There is nothing in the record to indicate that the damages Dr. Valdes claimed against the Hospital differed from those claimed against his former partners. Whether caused by the Hospital's sole wrongdoing or in conjunction with wrongdoing on the part of his former partners, Dr. Valdes suffered the same damages, i.e., his lost wages. Section 46.015, Florida Statutes, directs that a court set off the proceeds of any settlement with "any person in partial satisfaction of the damages sued for." Because Dr. Valdes did not plead or prove separate or distinct damages against his former partners, we must assume that the amount paid by them was intended to compensate Dr. Valdes in part for his lost wages. The trial court properly set off this amount against the full amount of damages determined by the jury. See Lauth By and Through Gadansky v. Olsten Home Healthcare, Inc., 678 So.2d 447 (Fla. 2d DCA 1996); Designs for Vision, Inc. v. Amedas, Inc., 632 So.2d 614 (Fla. 2d DCA 1994); Crown Cork & Seal Co. v. Vroom, 480 So.2d 108 (Fla. 2d DCA 1985); compare John Caddell Constr. Co. v. Mendez, 742 So.2d 425 (Fla. 3d DCA 1999).
We therefore affirm the judgment entered below in all respects.
JORGENSON, J., concurs.
*1155 SCHWARTZ, Chief Judge (dissenting).
In my opinion, the hospital, as a matter of law, committed no actionable wrong whatever. This is so because, as has been squarely held in several well reasoned decisions on operatively identical facts, the hospital's exclusion of Dr. Valdes from practice at its hospital was caused, not by a disciplinary decision to do sowhich might have given rise to the protections created by the bylaws and statute upon which the majority reliesbut by Palm Springs' decision to grant exclusive privileges to a group of which Dr. Valdes was not a member. As the court said in Garibaldi v. Applebaum, 194 Ill.2d 438, 252 Ill.Dec. 29, 32-33, 742 N.E.2d 279, 281-82 (2000):
The plaintiff contends that the hospital's exclusive contract with Cardiovascular Medical effectively revoked his privileges to perform open heart surgery at St. Francis and that the hospital's actions are subject to judicial review to determine whether he was afforded the necessary notice and hearing procedures in compliance with the hospital's bylaws. The plaintiff contends further that he may recover damages for the hospital's failure to provide him with notice and a hearing.
In this case, we do not believe that the plaintiff suffered a revocation, suspension, or reduction of his clinical privileges within the meaning of the hospital bylaws. By the terms of the bylaws, clinical privileges are defined as "the permission to provide medical or other patient care services in the Hospital within well-defined limits, based on the individual's professional license, experience, competence, ability and judgment." The granting of privileges, therefore, signifies that a doctor is qualified to practice at the hospital. There is no doubt, in this case, that St. Francis has determined that the plaintiff is qualified, and that determination is embodied in the privileges the plaintiff has been granted. The right to exercise those privileges, however, is a separate matter that may be affected by a host of hospital administrative decisions that are wholly unrelated to the doctor's professional competence or ethics. For example, a hospital may decide, for economic reasons, that it will no longer offer a particular medical specialty. Although the practical effect of that decision may be to curtail or even eliminate a practitioner's ability to exercise his or her privileges at the particular facility, the hospital's decision does not also signify that it has reduced or terminated the practitioner's privileges under its bylaws. Indeed, the hospital's decision would have nothing to do with the practitioner's competence to practice, which forms the central inquiry when privileges are reduced or terminated. See Engelstad v. Virginia Municipal Hospital, 718 F.2d 262, 267 (8th Cir.1983). In this case, the plaintiff fails to distinguish between his privileges and his ability to exercise those privileges in a "closed" environment. This distinction was illustrated by the court of appeals in Collins v. Associated Pathologists, Ltd., 844 F.2d 473, 481 (7th Cir.1988), which stated:
"Dr. Collins also asserts that St. John's [Hospital] wrongfully removed or reduced his staff privileges in violation of the by-laws of the hospital. However, the record reflects that St. John's has neither removed nor reduced Dr. Collins' staff privileges. * * * Staff privileges reflect the hospital's decision that a physician is qualified to practice in the facility, but do not in an of themselves confer employment. Employment as a pathologist at St. John's was determined by the legal contract between St. John's and APL [the exclusive contractor]. [Citation.] Although without concurrent *1156 employment by St. John's as a pathologist these staff privileges may be of little or no value to Dr. Collins, the fact remains that the privileges were neither removed nor reduced."
Likewise, in Holt v. Good Samaritan Hospital & Health Center, 69 Ohio App.3d 439, 442-444, 590 N.E.2d 1318, 1320-1321 (1990), the court roundly rejected the same argument which Dr. Valdes had advanced, and the court has accepted in this case:
Thus, the question before us is: Did Good Samaritan abuse its discretion when it entered into an exclusive contract with S.E.C. without providing a hearing to all physicians who might be "adversely affected" by this contract? We respond in the negative.
* * *
We agree with Good Samaritan and S.E.C. that if Holt's arguments were to prevail, it would be the death knell of exclusive contracts for medical services. Once having entered into a contract with a provider corporation, a hospital would be locked into continuing the association until the unlikely event that every member physician either ceased practicing medicine or lost his privileges due to incompetency. We will not substitute our judgment for that of hospital boards throughout the nation, by removing a managerial option that has been universally acknowledged as valid and beneficial to the efficient administration of health care.
Accord Gonzalez v. San Jacinto Methodist Hosp., 880 S.W.2d 436 (Tex.App.1994); Collins v. Associated Pathologists, Ltd., 844 F.2d 473 (7th Cir.1988), cert. denied, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).[3] But cf. Spunberg v. Columbia/JFK Med. Ctr., Inc., No. 97-8937 AH, 1997 WL 868607 (Fla.Cir.Ct. Dec.23, 1997), affirmed, 719 So.2d 298 (Fla. 4th DCA 1998).
For this reason, I would reverse the judgment below with directions to enter one for the hospital.
NOTES
[1] The medical staff year runs from May 1 through April 30.
[2] See J. Sternberg, S. Schulman & Assocs., M.D., P.A. v. Hospital Corp. of America, 571 So.2d 1334, 1337 (Fla. 4th DCA 1989) (Polen, J., dissenting) (where hospital decides to award exclusive contract for radiology services, former radiologists nevertheless entitled to a hearing before termination of their privileges); Lawler v. Eugene Wuesthoff Mem. Hosp. Ass'n, 497 So.2d 1261 (Fla. 5th DCA 1986) (holding that a breach of a hospital's bylaws in terminating a doctor's staff privilege was a sufficient basis for a breach of contract claim); Palm-Beach Martin County Med. Ctr., Inc. v. Panaro, 431 So.2d 1023 (Fla. 4th DCA 1983) (finding conflict in bylaws which provided that loss of a contract was cause for termination of medical staff membership while requiring a recommendation of medical staff and that decision to terminate not be arbitrary or capricious); Spunberg v. Columbia/JFK Med. Ctr., Inc., No. 97-8937 AH, 1997 WL 868607 (Fla.Cir.Ct. Dec.23, 1997), (determining that statutory criteria for revoking a physician's clinical privileges may not be abrogated by exclusive contract), affirmed, 719 So.2d 298 (Fla. 4th DCA 1998).
[3] Because, as these cases say, the hospital was fully within its rights in granting exclusive privileges to another group of radiologists, it can make no difference, contrary to what the majority seems to think, that the personal animosity of the hospital's president towards Dr. Valdes was also served by that action. See Ethyl Corp. v. Balter, 386 So.2d 1220 (Fla. 3d DCA 1980), pet. for review denied, 392 So.2d 1371 (Fla.1981), cert. denied, 452 U.S. 955, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981).