CASANUEVA, Judge.
University Community Hospital, Inc., (UCH) appeals a final judgment of liability and damages entered in favor of the eleven appellees. Because we find merit in a portion of UCH’s contentions, we affirm in part and reverse in part.
I. Factual Background
A. The Parties and the Shear Ahearn Exclusive Contract
UCH is a not-for-profit community hospital operating two campuses in Tampa, Florida. The appellees (“the physicians”) are radiologists who, until November 11, 2001, had privileges[1] granted by UCH to practice their medical specialty at UCH’s two campuses. The physicians were members of a professional association of radiologists, known by different names at various times, depending on the then current corporate structure of their association. *208 We shall refer to their professional association for purposes of this opinion as Shear Ahearn.[2] Shear Ahearn had an exclusive contract to provide radiology services to UCH dating from December 1986. The contract was renewed at each of its respective renewal dates with a minimum of formality. The physicians were among the forty to fifty Tampa-based radiologist employees of Shear Ahearn and were compensated by Shear Ahearn directly. Some of the physicians were partners in the association, and others were associates on a partnership track. The physicians spent varying amounts of time at UCH’s two campuses, depending on the nature of their different radiological subspeeialties. The physicians’ contracts with Shear Ah-earn contained a covenant prohibiting competition within the local area for a year if and when their association with Shear Ah-earn ended.
B. The Termination of the Exclusive Contract
In May 2001, UCH gave timely notice to Shear Ahearn that it would be terminating its exclusive contract for radiology services effective November 10, 2001. No one disputes that under its exclusive contract with Shear Ahearn, UCH was entirely within its rights to take this course of action as a business decision. However, UCH, through its credentialing committee,[3] had previously granted individual clinical privileges to each physician to practice radiology at UCH for two years and thus had formed separate contracts with each physician according to its own Medical Staff Bylaws. See Naples Cmty. Hosp., Inc., v. Hussey, 918 So.2d 323, 325 (Fla. 2d DCA 2006) (noting that Florida has adopted the majority view that hospital bylaws, which include medical staff bylaws, “become a binding and enforceable contract between a hospital and its medical staff when adopted by a hospital’s governing board”). Each radiologist received a letter essentially stating the following, taken from the letter sent to appellee Dr. Raymond Brooker on June 13, 2001:
This letter is to advise you that effective November 10, 2001, Shear Ahearn and Associates, P.A. will no longer be providing radiology services at University Community Hospital including UCH Medical Center and UCH Carrollwood. The Board of the Hospital has made a decision to change contract providers and further to maintain the provision of radiology services on an exclusive contract basis. Therefore, only those physicians who are employed by or affiliated with the group that is awarded the new radiology services contract at UCH will be permitted to exercise privileges covered by the new contract. We would like to take this opportunity to thank you for your services at UCH and advise you that unless you become associated with the new radiology contract provider, beginning November 11, 2001, you will no longer be able to exercise your clinical privileges to perform radiological procedures and/or interpretations at University Community Hospital, including the Carrollwood Campus (“the Hospital”).
*209 The decision made by the Board to change radiology contract providers is not reflective of the quality of clinical services that you individually have provided and does not trigger the hearing process under the Medical Staff bylaws or any reporting obligation....
Although UCH believed that it had not triggered the hearing process of the Medical Staff Bylaws, which was generally triggered by quality-of-care issues, it still offered a hearing to the physicians on its decision to change the exclusive radiology services provider. The hearing was held and various physicians attended, many with counsel. UCH’s decision to terminate Shear Ahearn’s exclusive contract did not change as a result of this hearing. Many of the physicians believed that UCH’s decision was beneficial to them because if they no longer had to perform under the exclusive contract, they could ethically refuse to perform certain services that provided less remuneration; under the Shear Ahearn exclusive contract, they had no such choice. However, after November 10, 2001, UCH did not allow the physicians to exercise their clinical privileges at UCH, either at its main campus or the Carrollwood campus, because they had not become affiliated with the new exclusive provider of radiology services. Following November 10, 2001, and faced with the loss of income from the exclusive contract with UCH, falling revenues or other reasons eventually led to the separation of each physician from Shear Ahearn.
C. The Breach of Contract Lawsuit Against UCH
On December 31, 2002, the physicians instituted this breach of contract suit against UCH, claiming that UCH had violated its own Medical Staff Bylaws by terminating or restricting the physicians’ clinical privileges despite the fact that none of the physicians had triggered one of the three possible situations that would cause a loss of privileges without a hearing.[4] The case was hotly contested throughout 2003 and 2004, with UCH filing affirmative defenses and numerous counterclaims. The liability portion of the case was decided by cross-motions for summary judgment based on a joint stipulation of uncontested facts. In June 2005, the Honorable Circuit Court Judge Ralph Stoddard granted the physicians’ motion for summary judgment on liability and denied UCH’s, despite UCH’s argument that it at no time had told the physicians that their medical staff privileges were terminated, revoked, suspended, curtailed, or restricted, but only that they could not “exercise” their privileges.[5] Judge Stoddard found that UCH had terminated the physicians’ medical staff privileges in breach of its Medical Staff Bylaws, not because of any behavior proscribed by the Medical Staff Bylaws but so that UCH could enter into an exclusive contract with a different radiology group.
On November 9, 2005, this court rendered its opinion in Hussey, 918 So.2d 323. In that case, Dr. Hussey was denied renewal of his privileges when Naples Com *210 munity Hospital entered into an exclusive agreement with another provider for the same services. We held: “The hearing process described in the Bylaws clearly does not apply when a staff member is denied reappointment because of a business decision to enter into an exclusive contract with another provider.” Id. at 827. UCH presented this opinion to Judge Stoddard in an attempt to change his decision on the liability issue, but to no avail. Judge Stoddard found it factually distinguishable[6] and denied UCH’s request to revisit his ruling in favor of the physicians on the liability issue.
Facing an extremely complicated trial on damages specifically tailored to the individual circumstances of each of the eleven physicians, the parties agreed to hold the trial on damages before a one-person “jury,” retired Thirteenth Judicial Circuit Judge Gaspar Ficarrotta. Judge Ficarrot-ta conducted a seventeen-day trial on damages on various days between December 2005 and April 2006.[7] At the trial, each physician testified to his or her own individual situation and to how he or she had suffered from the loss of privileges at UCH. For example, because radiology is a hospital-based specialty, each physician lost professional relationships and referrals as a result of the termination of the clinical privileges. The physicians also presented an expert witness, Kevin Kwan, CPA, who based his methodology, in part, on an assumption that it would take about five years for each physician to reach a level of compensation that would mitigate the damages they would have incurred as a result of being denied the ability to practice at UCH. UCH did not present an expert witness to rebut Mr. Kwan.
Judge Ficarrotta reported his findings on damages to Judge Stoddard on September 6, 2006, and based on this, Judge Stoddard entered a final judgment on liability and damages.[8] Following various posttrial motions, a corrected final judgment was rendered on March 2, 2007, after which a timely notice of appeal was filed.
D. The Appeal Issues
On appeal, UCH raises two main issues, each of which comprises various sub-issues. First, UCH contends that Judge Stoddard erred in finding in favor of the physicians on their liability claim that UCH breached the medical staff bylaws. Specifically, UCH claims that Hussey should have resulted in an outcome in its favor because Hussey stands for the proposition that a business decision to enter into an exclusive contract for specialty services does not implicate the due process requirements that are triggered when a physician’s staff privileges are terminated on account of quality-of-care concerns. Despite the fact that it had entered into a *211 joint stipulation of uncontested facts and moved for summary judgment itself, UCH further claims that the summary judgment was error because Judge Stoddard found an ambiguity in the contract and resolved that issue as a matter of law instead of submitting it to a factfinder. The ambiguity Judge Stoddard noted was the term “actions of an administrative nature,” which the medical staff bylaws exempted from the requirement of a hearing before termination of clinical privileges. Assuming that the finding on liability was not error, UCH then contends that the valuation method used was so flawed in several respects that each damages award cannot stand. UCH argues that the physicians did not meet their burden of establishing lost earnings that were reasonably foreseeable and based on evidence that was not speculative. UCH faults Mr. Kwan’s evidence and methodology, claiming they were conceptually defective, contradicted by record evidence, and riddled with speculative assumptions. Beyond this, UCH contends that it presented undisputed evidence that each physician had either mitigated any alleged lost earnings by earning more money after termination of privileges or had experienced lower earnings by reason of lifestyle and professional choices or unforeseeable intervening events.
II. The Standard of Review
We review Judge Stoddard’s finding of liability for breach of contract de novo. Fayad v. Clarendon Nat’l Ins. Co., 899 So.2d 1082 (Fla.2005); Rodriguez v. Tombrink Enters., Inc., 870 So.2d 117 (Fla. 2d DCA 2003). The award of damages based on Judge Ficarrotta’s trial is reviewable for an abuse of discretion. Owens-Coming Fiberglas Corp. v. Ballard, 749 So.2d 488 (Fla.1999); Glabman v. De La Cruz, 954 So.2d 60 (Fla. 3d DCA 2007).
Using these standards, we conclude first that Judge Stoddard properly entered a summary judgment against UCH, finding it liable for breach of contract by violating its own medical staff bylaws and refusing the physicians the exercise of their clinical privileges. We disagree with Judge Stod-dard’s legal conclusion that the contract contained an ambiguity, but this does not change the result that summary judgment was proper. However, we agree with UCH that Judge Ficarrotta abused his discretion in relying on the physicians’ expert on damages, Mr. Kwan, who used faulty methodology in determining damages. Therefore, the awards of damages must be reversed.
III. Analysis
A. Liability for Breach of Contract
1. The Exclusive Provider Contract
All parties agree that this is a breach of contract case. It is complicated by the fact that two sets of contracts are involved. The first set contains just one contract, the exclusive provider contract for radiological services between UCH and Shear Ahearn (the “exclusive provider contract”). Although reference to the exclusive provider contract is necessary to understand our disposition of the case, there was no breach of this contract, and it is not at issue in this case. A hospital’s business judgment to enter into a new exclusive provider contract for medical specialty services with a different provider group is nothing if not an administrative decision. See Hussey, 918 So.2d at 325. Significantly, all parties here agree that UCH was within its rights to terminate the exclusive provider contract. Moreover, no party contended before the circuit court or before this court that the decision to terminate the exclusive provider contract was anything other than an administrative decision. Although UCH’s decision to end its affiliation with Shear Ahearn was an administrative decision in an overall hospi *212 tal management context, it has a different effect in a different context, as we discuss below.
2. The Privileges Contracts
The second set of contracts contains eleven similar contracts, i.e., the contracts for clinical privileges between UCH and each physician (the “privileges contracts”).
At issue in this case, and determinative of its outcome, is the language of the second set of contracts, each physician’s contract for clinical privileges as determined by UCH’s Medical Staff Bylaws. This court recognized in Hussey, 918 So.2d at 825, that Florida follows the general rule that hospital bylaws become a binding and enforceable contract between a hospital and its medical staff when adopted by a hospital’s governing board. Thus, while UCH may properly determine which physicians are granted clinical privileges to practice there, once granted, those privileges either expire at the conclusion of the awarded term or in accordance with the bylaws or rules established by UCH. UCH’s troubles in this instance stem from its decision not to follow its own bylaws in terminating the physicians’ clinical privileges. UCH’s own evidence shows that it perceived no quality-of-care issue with any of the physicians here. Instead, UCH used its award of a new exclusive provider contract as a basis to prematurely terminate the physicians’ clinical privileges contracts. There is no language in the relevant Medical Staff Bylaws linking the exclusive provider contract with each physician’s clinical privileges contract. Thus, the two contracts are not mutually dependent and the termination of the exclusive provider contract does not justify the termination of the privileges contracts.[9]
Article VIII (“Corrective Action”) and Article IX (“Interviews, Hearings And Appellate Review”) of the Medical Staff Bylaws, Rules and Regulations set forth the criteria and procedure for terminating a physician’s clinical privileges. It is undisputed that UCH did not follow these procedures that were required by its own contracts with each physician, i.e., the Medical Staff Bylaws. Thus, UCH clearly breached the physicians’ privileges contracts.
UCH argued to the circuit court, as it argues to this court, that this prima facie breach is excused by virtue of another provision of the same Bylaws. Article VII of the bylaws is titled “Determination of Clinical Privileges,” and section 7.2-2 is specifically titled “Basis for Privileges Determinations.” UCH argues that its breach is excused by the following highlighted language of paragraph 7.2-2:
Decisions or recommendations related to clinical privileges shall consider quality of care issues. With the exception of actions of an administrative nature, privileges may not be revoked, revised or renewed without the consideration of quality of care.
The circuit court determined that the underscored language of the contract is ambiguous, but we cannot agree. The Bylaws, i.e., the privileges contracts, clearly demonstrate that a physician’s clinical privileges cannot be terminated during the term of those .privileges without proper consideration of the physician’s quality of care, unless it is due to administrative *213 action.[10] The phrase “with the exception of actions of an administrative nature” separates quality of care concerns from actions that the governing board of UCH may take in overall management of the hospital, but does not excuse the hospital from following the due process safeguards accorded the physicians in each’s privileges contract. Such general management decisions by the hospital’s governing board “would have nothing to do with the practitioner’s competence to practice.” Palm Springs Gen. Hosp. Inc. v. Valdes, 784 So.2d 1151, 1155 (Fla. 3d DCA 2001) (Schwartz, C.J., dissenting). But neither do they mean that due process rights in the Bylaws should be disregarded.
“When it is clear from the language or overall scheme or plan of a contract that the parties intended for various provisions to operate independently of each other, the court must enforce the contract as written.” Moore v. State Farm Mut. Atito. Ins. Co., 916 So.2d 871, 875 (Fla. 2d DCA 2005) (enforcing separate contractual provisions anticipating different types of attorney representation in one overarching contract); see also Paddock v. Bay Concrete Indus., Inc., 154 So.2d 313, 316 (Fla. 2d DCA 1963) (“It is not within the power of a court to make a contract for the parties, and an unambiguous agreement must be enforced in accordance with its terms.”). Because there was no ambiguity in the contracts represented by the Medical Staff Bylaws,[11] the circuit court properly entered summary judgment on liability in favor of the physicians because UCH terminated their privileges without following the procedures outlined in its own Bylaws.
The real issue between these parties stems from the consequences of UCH’s favoring one contract — the exclusive provider contract — over the others. But, as UCH is the common party for both contracts and as its actions precipitated the problem, the competing consequences, as evidenced by this case, will be most felt by it.
B. Damages For Breach Of The Privileges Contracts
In light of Judge Stoddard’s correct conclusion that UCH breached the eleven privileges contracts, we now turn to discuss the damages portion of the judgment. It is important to distinguish the timeline of the exclusive provider contract from the timelines for the eleven privileges contracts. The timelines of the two sets of contracts are not coterminous. The timeline of the exclusive provider contract expired on November 10, 2001. The privileges contracts’ timelines ended at the expiration date of each physician’s clinical privileges term with UCH. UCH breached each physician’s privileges contract at the end of business on November 10, 2001, when, after that date and without being afforded their rights under the Bylaws, the physicians were not allowed to practice at either of UCH’s campuses. There is no dispute that the exclusive provider contract’s timeline ended well before any of the two-year terms of the privileges contracts.
*214 UCH is not the direct employer of the physicians; Shear Ahearn is. But the privileges contracts are what allows them to be compensated under their contract with Shear Ahearn vis-a-vis their services at UCH’s two campuses. Therefore, we do not hesitate to analogize to employment contract cases. “In employment contract cases the damages sought — the lost wages — were earned under the contract and could only be earned as long as the contract was in force.” Bankers Risk Mgmt. Sens. Inc. v. Av-Med Managed Care, Inc., 697 So.2d 158, 161 (Fla. 2d DCA 1997); see also Physicians Reference Lab., Inc. v. Daniel Seckinger, M.D. & Assocs., P.A., 501 So.2d 107, 108-09 (Fla. 3d DCA 1987) (“The measure of damages for the breach of a contract to furnish services is the amount of profit the non-breaching party would have earned during the remainder of the term of the contract had there been no breaeh[,]” citing Poinsettia Dairy Prods., Inc. v. Wessel Co., 123 Fla. 120, 166 So. 306, 310 (1936)).[12] Thus, the damages period began when UCH breached each physician’s contract for clinical privileges on November 11, 2001. For example, in at least one case, the privileges contract was set to expire subject to reappointment on January 31, 2003. Consequently, the period of damages to calculate was limited to approximately fourteen and a half months in that instance. Cf. Bernhardt v. Jacksonville Med. Ctr., Inc., 543 So.2d 833 (Fla. 1st DCA 1989) (holding that for breach of the employment contract by the hospital’s failing to give the pathologist the requisite notice of its intent not to renew their contract at least ninety days prior to the end of the contract’s twelvemonth term, the pathologist was entitled to damages equal to three months of his average monthly income in addition to the residual income from extra services he rendered that the contract allowed while he was employed).
The physicians presented, and the circuit court accepted, their expert’s calculations based on a five-year period that each physician would need to reclaim the same level of salary enjoyed at the time of the breach. The circuit court erred in accepting this as the proper measure of damages. The correct period during which to measure damages is the remaining term of the contract for clinical privileges.[13] At a min *215 imum, the rate of earnings for that period should be calculated based on each physician’s prior record of earnings.
Conclusion
We affirm the summary judgment on liability in favor of the physicians, reverse the judgment for damages, and remand for further proceedings in conformity with this opinion.
DAVIS, J., and DAKAN, STEPHEN L., Associate Senior Judge, Concur.

. UCH’s Medical Staff Bylaws, Rules and Regulations, Definitions, states that “clinical privileges” or "privileges” means "the permission granted to a practitioner to render specific diagnostic, therapeutic, medical, dental, podiatric or surgical services.” Article VII, paragraph 7.1 of the Medical Staff Bylaws states that the "[g] ranting or renewal/revision of clinical privileges are made for a period of not more than two years.”

. The official name of the association was Shear Ahearn and Associates, P.A. It was later known as Team Health, Inc., or Team Physicians of Florida, P.A.

. The process of credentialing a physician starts with the credentialing committee, who forwards its recommendations to the Medical Executive Committee that reviews the recommendations, who then forwards its report and recommendations to the president of the hospital for presentation to the hospital's governing board of trustees for final action. See Art. VI of the Medical Staff Bylaws ("Procedures for Appointment and Reappointment”).

. These three situations were (1) where a physician's actions have been detrimental to a patient or otherwise "disruptive,” necessitating "corrective action”; (2) where a physician has shown a "willful disregard” for the risk management and other policies found in the hospital’s bylaws, which could result in "immediate” or "summary” suspension; and (3) where the physician's professional license or medical malpractice insurance is not current, where the physician fails to appear at mandatory meetings, or where the physician has failed to complete medical records in a timely fashion, which could result in "automatic suspension.”

. We, as did Judge Stoddard, reject this argument as a distinction without a difference.

. We also find Hussey factually distinguishable. Dr. Hussey was denied reappointment of his clinical privileges at the end of his credentialing term. Hussey, 918 So.2d at 327. The physicians in this case had their clinical privileges canceled midterm.

. The physicians argue, as a threshold matter, that we are without jurisdiction to review this matter because UCH untimely filed its notice of appeal. The basis for this argument is that retired Judge Ficarrotta rendered a "verdict” on damages rather than a "judgment.” The circuit court rejected this argument as do we, without further discussion.

.The following amounts were awarded: $165,573 to Dr. A. Raymond Brooker; $298,230 to Dr. Donald W. Durrance; $28,631 to Dr. David Epstein; $330,256 to Dr. Michael P. Flynn; $36,756 to Dr. Mark H. Jaffe; $44,528 to Dr. Thomas A. Okulski; $51,993 to Dr. David Rosenbach; $24,347 to Dr. Jana Sulzer; $24,083 to Dr. Dario Topol-cic; $28,718 to Dr. Enrique Urrutia; and $215,788 to Dr. James R. Wilson. The damages totaled $1,248,903, not including costs and attorney’s fees.

. Many hospitals do link these kinds of contracts, so that the individual clinical privileges of a member of an exclusive provider group are automatically terminated if another exclusive provider group is substituted to provide the same services. That was not, however, the circumstance at the genesis of this case.

. We emphasize that the context is "during the term” of the clinical privileges. The Bylaws also recognize this by virtue of the phrase that follows the underscored language, i.e., "privileges may not be revoked, revised or renewed." Revocation, revision, or nonre-newal cannot occur upon first appointment of privileges. If the circumstances of this case had happened when the physicians' clinical privileges were due for review at the end of the clinical privileges term, Hussey, 918 So.2d 323, would have controlled.

. UCH essentially recognized that the contract had no ambiguity because it, itself, moved for summary judgment on liability.

. A succinct statement of the problem is provided in Indian River Colony Club, Inc. v. Schopke Construction & Engineering, Inc., 592 So.2d 1185 (Fla. 5th DCA 1992):
In this case, the owner purported to terminate the contract but did not meet the requirements to do so and, instead, merely breached it. When a contract is breached it does not terminate; it continues to exist. See generally 11 S. Williston, A Treatise on the Law of Contracts §§ 1305-1308 (3rd ed. 1968). As Williston points out, this is a source of "serious confusion”. Id. at § 1305. What actually occurs is that the innocent party is entitled to treat his obligations under the existing contract as discharged and sue for the damages occasioned by the breach.
592 So.2d at 1189 (Griffin, J., specially concurring).

. UCH presented five bases to show how the damages award was in error. We have discussed only one of them, that the remaining term of each physician’s clinical privileges contract is the proper period in which to calculate damages for that physician. UCH’s other four bases to attack the damages awards have merit (i.e., a party can only recover damages which naturally flow from a breach; recoverable damages are those which were reasonably contemplated by the parties at the time they entered into the contract; damages from unforeseeable, independent intervening causes are not recoverable; and damages cannot be awarded on the basis of speculation or conjecture). Because these four grounds represent basic tenets in the law of contracts and damages, we do not find it necessary to discuss them and how they are applicable to the varying circumstances of eleven different physicians. Given our disposition that the period of damages can only be *215 the remaining term of each physician’s clinical privileges contract, a damages award based on a fairly straightforward calculation of average monthly salary is indicated, as Bernhardt, 543 So.2d 833, suggests. If the circuit court is guided by Bernhardt, it is unlikely that a trial as lengthy as the first seventeen-day trial on damages will be necessary to merely accept evidence relating to mitigation of damages in the fairly limited post-breach period of each physician’s clinical privileges contract term. See id. at 835 (stating that " 'the plaintiff employee has a duty to mitigate his damages by reasonably seeking other employment of like nature subsequent to the breach of contract[,]' ” (quoting Juvenile Diabetes Research Found, v. Rievman, 370 So.2d 33, 35-36 (Fla. 3d DCA 1979))).