296 So.2d 104 (1974)
TROPICANA POOLS, INC., a Florida Corporation, Appellant,
v.
John E. BOYSEN and His Wife, Cordula A. Boysen, Appellees.
No. T-198.
District Court of Appeal of Florida, First District.
June 25, 1974.
J. Richard Knop, of Mateer & Harbert, Orlando, for appellant.
Edwin C. Cluster, of Ayres, Swigert, Cluster, Tucker & Curry, Ocala, for appellees.
*105 BOYER, Acting Chief Judge.
We here review a final judgment entered pursuant to a jury verdict in favor of plaintiffs below, appellees here.
Some weeks prior to July 22, 1970, the plaintiffs contacted several swimming pool companies in Central Florida for bids on the swimming pool which they desired to have installed at their new home which they were about to have built in Ocala. After receiving bids from several swimming pool companies they chose the defendant (appellant here) because they had previously heard of it and believed it to be a reliable company. The defendant's bid was not the lowest, but the plaintiffs chose the defendant because of its general reputation for good work. After negotiations, the plaintiffs and the defendant entered into a contract which called for a cash purchase price of $6,000.00 and which contained a detailed account of the responsibilities of each of the parties. It was totally and completely drawn by the defendant and the plaintiffs simply affixed their signatures. In addition to the work to be performed pursuant to the written contract, the defendant orally agreed to put in additional "decking" to extend around the area of the pool and join the house. The price agreed upon for the latter was to be approximately $1,300.00 in cash.
The defendant is a large corporation whose business is the installation of swimming pools in Brevard, Marion, Orange and Volusia Counties. The defendant holds itself out as a company which has expertise in the construction and installation of swimming pools. The plaintiff John E. Boysen is and was a medical doctor who is now the County Health Officer in Marion County. The plaintiffs have no expertise nor experience in the field of constructing and installing swimming pools.
The construction of the plaintiffs' pool began in the month of September, 1970, and was completed near the end of December, 1970. At the time of completion, employees of the defendant came to the plaintiffs' home and showed Dr. Boysen how to operate the pool. He was then given a "Lifetime Structural Guarantee', which he had never seen before and of which he was unaware until it was presented to him at that time. The "Lifetime Structural Guarantee" was not mentioned in the original contract. The pool, at this point, worked satisfactorily. The plaintiffs paid approximately $7,300.00 in cash for the pool and decking area.
Within a few weeks after completion of the pool, the plaintiffs noticed that there were cracks in the tile and that the pool was losing water. The water loss was approximately 400 gallons of water per day. Later a large crack, approximately one-half inch wide, appeared in the decking and eight or ten of the tiles around the edge of the pool dropped off the side into the water. The crack stretched from the pool across the decking to the corner of the plaintiffs' house. By October 21, 1971, approximately ten months after installation, the pool was losing 900 gallons of water every six to eight hours which, if the pool was filled, amounted to 2,700 gallons of water a day. The defendant responded to the plaintiffs' complaints by replacing the tiles and little else. The plaintiffs informed defendant that the "skimmer", which cleans the pool, would not work because the loss of water brought the level too low, but the condition was not remedied and only unsatisfactory solutions were suggested. The plaintiffs traveled to Orlando seeking a solution to the problem but the defendant responded with only a temporary patch-up job, and following further complaints continued to patch up the pool without permanent results. The plaintiffs had requested help at least once a month. At the end of one year, the defendant refused to do anything further and told the plaintiffs that they should fix the pool. On the date of trial the pool leaked 900 gallons of water every six to eight hours, tile fell off occasionally, and the cracks in the deck and in the pool remained.
*106 The real issues for decision in this case, as presented by appellant, are whether the greater weight of the evidence showed: (1) that the pool was defective; (2) that the plaintiffs sustained legally recoverable damages as a result of the defectiveness of the pool; and (3) that the defendant was legally liable for the defects and damages suffered by the plaintiffs.
The evidence overwhelmingly proved that the pool was defective. Testimony and documentary proof were introduced to show that: (1) the pool lost thousands of gallons of water over the period running from its construction to the date of trial; (2) the shell of the pool had unsightly cracks in it; (3) the tile constantly fell off; (4) the decking cracked and caused the house to crack; (5) the pool tilted giving it an odd appearance; and (6) the skimmer action in the pool would not perform leaving the pool with trash and debris on its surface. The defendant introduced nothing to rebut such evidence. The only evidence presented by the defendant related to an examination by Charles L. Myster, a registered professional engineer who was hired by the defendant to determine whether there were subsoil defects in and around the pool. He testified that he found there were subsoil defects. In response to questions by defendant's counsel about whether blasting, big trucks and buildings could cause alterations in the subsoil, Mr. Myster answered that they most definitely could. This proved nothing because there was no evidence to show that either before or after the pool was constructed any blasting occurred, big trucks rolled by, or that extensive building took place. It is clear that the pool was defective.
The next question is whether the plaintiffs sustained damages as a result of the pool's defectiveness. The plaintiffs introduced testimony to show that the pool would drain to a level where the skimmer action would not work, resulting in an unsightly accumulation of trash and debris upon the pool's surface making it unfit for use. The water that seeped from the pool saturated the material under the decking and caused it to move about, which in turn caused cracks in the decking and adjacent house. Tile on the edge of the pool continuously fell off and unsightly cracks appeared in the pool. The evidence presented by the plaintiffs showed that it would cost $4,500.00 to correct these defects. Again, no evidence was presented by the defendant to rebut the evidence that the damages flowed from the defective condition of the pool or that the amount of damages is unreasonable.
The remaining question is whether the defendant is legally liable for these conditions.
The defendant expressly warranted in the contract which it drew that it would build a "swimming pool" for the plaintiff of the type and shape described in the contract and that:
"... all materials used in completing installation, contracted for herein, will be of high quality and new, and that all work will be done in a workmanlike manner. Any breach therein, causing any substantial defects, shall be remedied without charge, providing written notice is given TROPICANA POOLS, INC., within one year from completion. It is agreed, however, that no claim may be filed under this warranty and no obligations to make adjustment thereunder, will accrue until full indebtedness of the owner to TROPICANA POOLS, INC., is paid. Finished products purchased by TROPICANA POOLS, INC., (such as motors, pumps, fittings and accessories), for use in this installation are subject to the manufacturer's guarantee  and TROPICANA POOLS, INC., makes no warranty expressed or implied thereto. The above proposal shall be null and void unless accepted within two weeks following date submitted."
There is no dispute but that the defendant was notified within the proper time and accepted the notification as adequate. *107 It made superficial repairs to the pool for one year without correcting the condition, then told the plaintiffs to make their own. At the end of one year the defendant took the position that the troubles were due to subsoil defects for which it was not liable. In its own contract, however, the defendant stated that it had the right to charge the plaintiffs additional sums if it encountered inadequate soil bearing capacity. The specific clause reads:
"... Should unknown underground conditions be encountered, such as but not limited to, underground water pipes, and conduits, hard pan, rock, inadequate bearing capacity, water seepage or other material, requiring the use of compressors, blasting, pumping, etc., the charges for or additions to the pool structure or other installations necessitated by such conditions shall be paid by the owner at TROPICANA POOLS, INC., billing price, unless otherwise stated herein... ." (Emphasis added)
The plaintiffs agreed to the above quoted clause and, in effect, agreed with the defendant that if any of such conditions existed then the defendant would be paid additional sums to cover the expenses resulting therefrom. Certainly no reasonable interpretation of the above quoted clause would impose the responsibility upon the plaintiffs to go out to the pool site, check for soil bearing problems, inform the defendant of the condition, and then pay the extra costs. The defendant was the one who did the digging and presumably had the expertise to determine if the soil would or would not support the pool. Since the plaintiffs could not have known the exact weight, material content, stress capacity and other technical factors which determine whether the soil capacity is sufficient, it is apparent that they could not have made any determination as to whether the capacity of the soil was or was not sufficient. Further, any reasonable man would assume that when a person tells him that he will charge more if a certain condition is encountered, the determination of whether it is encountered will be made by the person making the charge. If it is to be otherwise, an expression of that exception should be made and the duties of each party spelled out. This proposition is even more cogent when one remembers that it was the defendant, Tropicana Pools, Inc., who drew the contract. Therefore, there really is no question that the duty to determine whether the soil bearing capacity was sufficient rested with the defendant, as the trial court ruled.
The defendant tried to negate the fact that it expressly warranted that "all work would be done in a workmanlike manner", including a determination that the soil bearing capacity was sufficient, by reverting to language in the "Lifetime Structural Guarantee", which provides as follows:
"... The Lifetime structural guarantee is also invalid should the pool not be kept full, or should the structure be damaged by earthquake, war, earth or earth fill movement, of disasters not occasioned by the Contractor, such as explosions, wrecking and the like or because of inadequate soil bearing capacity. And that further there is no transfer or change of ownership in the subject property. Terms and provisions of this guarantee are not to be effective until final payment of contract is received... ."
That document was delivered to the plaintiffs after the pool was completed and they had neither seen nor heard of it before.
In the case of Rehurek v. Chrysler Credit Corp. et al., Fla.App.2d 1972, 262 So.2d 452, an auto dealer claimed that a warranty booklet delivered after the sale was consumated was effective to exclude or modify implied warranties of merchantability or fitness. The court there quoted from Anderson, Uniform Commercial Code, Vol. 1, at page 95, and said:
"... `A limitation of warranties to be effective must have been bargained *108 for so that a limitation stated in printed matter given by the seller to the buyer after the sale was completed is not binding; as where the automobile dealer, after the sale, gave the buyer the manufacturer's printed material which contained the warranty limitation.'" (Emphasis added)
Although the above case dealt with the implied warranties of merchantability and fitness, the quotation is equally applicable to express warranties under circumstances as here exist. The point is that warranties made at the time of the initial bargain cannot subsequently be limited or modified by the delivery of either printed or written documents. (Unless agreed to by the party to whom the initial warranty extended.) Should the law be otherwise, the seller could wait until a defect appeared before limiting his liability. The defendant's attempt to limit the applicability of the express warranty contained in the initial contract, by subsequently delivering to the plaintiffs the "Lifetime Structural Guarantee", was clearly ineffective.
It is "hornbook law" requiring no citations of authority, except common sense, that a contract once entered into may not thereafter be unilaterally modified; Subsequent modifications require consent and "a meeting of the minds" of all of the initial parties to the contract whose rights or responsibilities are sought to be affected by the modification.
It is readily apparent, that the defendant had a contractual duty to construct the pool without structural defects of the type previously described. The defendant expressly and impliedly warranted that it would do so. When it failed, it breached its express warranty contained in its contract and its implied warranty of merchantability.
We have considered the other points raised by appellant and find them also to be without merit.
Affirmed.
McCORD, J. and DREW, (Ret.) Associate Judge, concur.