Abraham WALLACE et al., Plaintiffs

v.

NCL (BAHAMAS) LTD., Defendant.

Case No. 09–21814–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 7, 2012.

Charles R. Lipcon, Michael A. Winkleman, Lipcon Margulies & Alsina, Jason Robert Margulies, Lipcon Margulies, Alsina & Winkleman, P.A., Carlos Felipe Llinas Negret, Law Offices of Lipcon, Margulies & Alsina P.A., Miami, FL, for Plaintiffs.

Israel Jovanny Encinosa, Sanford Lewis Bohrer, Alex M. Gonzalez, Israel Jovanny

Encinosa, Scott Daniel Ponce, Holland & Knight, Miami, FL, for Defendant.

ADALBERTO JORDAN, District Judge.

After considering the arguments of counsel, the stipulations of the parties, and the evidence presented at the bench trial held in this case, I enter the following findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

## I. FINDINGS OF FACT

After one cruise ends and before another begins, a cruise ship must be cleaned. The late writer David Foster Wallace once described this process as "several battalions" of "stewards ... obliterating all evidence" of the previous cruise before the new passengers arrive. DAVID FOSTER WALLACE, *A Supposedly Fun Thing I'll Never Do Again* 273 n.17, *in* A SUPPOSEDLY FUN THING I'LL NEVER DO AGAIN (1998). In this case, the senior stewards in those battalions are suing the owner of the cruise ships on which they worked, alleging, among other things, that they could not complete their work in the time allotted and had to hire other employees to help them.

### A. INTRODUCTION

Everol Barrant, Pauline Haughton, John George James, Adrian Nash, Glenford Palmer, and Abraham Wallace all worked for NCL (Bahamas) Ltd., a cruise line that owns and operates the vessels *Pearl, Jewel, Sun, Star, Wind, Spirit, Dream, Dawn, and Majesty.* Mr. Barrant, Ms. Haughton, Mr. James, Mr. Nash, Mr. Palmer, and Mr. Wallace worked on these vessels as senior stateroom stewards. On embarkation day—i.e., the day a cruise ends, passengers disembark, and new passengers board—these senior stewards cleaned the empty rooms before new passengers embarked on the ship. *See* D.E. 369 at 194; D.E. 371 at 6.

According to the plaintiffs, between May 14, 2006. and June 14, 2009, NCL made it impossible for them to complete their work on embarkation day. NCL, they say, assigned them too many cabins, gave them no assistance, and had impossible standards. Plus, NCL implemented a new policy, called "Freestyle" cruising, which let passengers stay onboard late on embarkation day. As a result, the plaintiffs could not start cleaning their assigned cabins until mid- to late-morning. Yet, the plaintiffs assert, NCL required that senior stewards clean the cabins by 1:30 p.m. or 2:00 p.m. The work was mammoth, and the time minute, so the plaintiffs could not finish their work on time.

This left the plaintiffs, like ancient seafarers in Greek mythology, between Scylla and Charybdis. They could either try (and fail) to clean the cabins themselves, in which case they risked their employer's reproach, or they could hire someone to help them. They chose to hire helpers. The plaintiffs allege that, to timely finish their work, they needed to hire two helpers, at the cost of $75 per helper per embarkation day.[1] NCL essentially forced them to pay helpers to clean the cabins on time, the plaintiffs allege, and by so doing NCL failed to pay their full wages and violated the Seaman's Wage Act, 46 U.S.C. § 10313(f). The plaintiffs also contend that NCL's conduct breached their em-

---

1. To put this sum in perspective, the monthly salary of the senior stateroom stewards was, on average, $2,796. And the senior stateroom stewards had about four embarkation days per month. At $75 per helper, two help-ers per embarkation day, and four embarkation days per month, that comes out to $600 per month, or over 20% of their wages, spent by the senior stateroom stewards.

ployment contracts' covenant of good faith and fair dealing.

## B. The Senior Stewards' Duties

The evidence shows that during the relevant period—between May 14, 2006 and June 14, 2009—Mr. Barrant, Ms. Haughton, Mr. James, Mr. Nash, Mr. Palmer, and Mr. Wallace worked as senior stewards. They signed employment contracts with NCL. Through these contracts, NCL employed the plaintiffs for (about) ten months, during which the plaintiffs lived on the cruise ships. From there, the plaintiffs would take two months of vacation before they signed new employment contracts with the same conditions. *See* D.E. 348 at 3. The employment contracts all incorporated the collective bargaining agreement executed by NCL and the Norwegian Seafarers' Union for Catering Personnel, which represents all senior stewards. *See id.*; D.E. 366–90 at 2. The collective bargaining agreement set all senior stewards' pay rates and guaranteed that each month NCL employees would be entitled to 100% of their wages minus approved deductions. *See* D.E. 366–2 at 3–4.

On embarkation day, senior stewards had the following responsibilities (if not more):

- strip the beds of their linens and sheets;
- separate the linens and sheets;
- make the beds;
- dust the cabin;
- sanitize the cabin's handrails, door handles, closet doors, frequently touched areas, and telephones;
- clean any used coffee pots and ice buckets;
- separate the garbage into bottles, cans, paper, and plastic;
- take the garbage to the incinerator; and
- vacuum the cabin and hallways.

*See* D.E. 366–63 at 3; D.E. 371 at 8, 25–28, 43, 58, 101. Senior stewards had to do this for somewhere between 30 to 35 cabins. *See* D.E. 369 at 194; D.E. 371 at 52. The parties bickered over how many beds 30 to 35 cabins contained, but most of the plaintiffs and some of NCL's witnesses testified that senior stewards had to strip and make at least 70 beds. *See* D.E. 369 at 196; D.E. 371 at 19, 115; D.E. 372 at 70.

What's more, NCL had rigorous standards that, according to the evidence, required immaculate cabins. *See* D.E. 371 at 56, 123. And, as one would expect, NCL had a quality-control system to randomly check the cabins for cleanliness. *See id.* at 56–57.

## C. The Senior Stewards' Working Hours

Senior stewards technically started their work at 7:00 a.m. on embarkation day. But, understandably, no passenger would leave his or her cabin at 7:00 a.m., and few passengers would leave before 8:30 a.m. *See* D.E. 369 at 234; D.E. 371 at 70, 226. To understand why, one must comprehend NCL's "Freestyle" cruise experience.

In 2000, NCL formulated something called the Freestyle cruise. A Freestyle cruise was neither staid nor formal. To the contrary, NCL's Freestyle cruise sought to maximize relaxation for its passengers. To create a relaxed ambiance, NCL allowed passengers to disembark as they saw fit. Before NCL implemented the Freestyle cruise experience, it required passengers to leave their cabins by 8:00 or 8:30 a.m. With Freestyle cruising, passengers could stay as long (or almost as long) as they liked. *See* D.E. 366–79 at 5; D.E. 371 at 24.

The plaintiffs essentially testified that almost all passengers remained in their cabins until 10:30 a.m. or 11:00 a.m. because of the Freestyle cruise policy. The plaintiffs maintained that the Freestyle

cruise policy barred them from working in any meaningful sense until around 11:00 a.m. This testimony does not completely convince me. Passengers could not stay on the cruise ship forever. After all, they needed to go through customs and return home. Still, the testimony and e-mails introduced at trial make it clear that the Freestyle cruise policy caused passengers to leave late and created problems on embarkation day. *See* D.E. 366–54 at 3. Given this evidence, I find that most passengers anchored themselves in their cabins until 9:30 a.m. or 10:00 a.m. Few, I conclude, left before 8:30 a.m.

Regardless of when they started, the senior stewards did not have all day to clean their assigned cabins. Cruises are exciting, a sea vacation on a palatial ship. Curiosity would get the best of new passengers, and the passengers would venture to their rooms soon after boarding. Thus, NCL required that all cabins be cleaned by 2:00 p.m. *See* D.E. 371 at 103, 129.

The laid-back departure of passengers, the eager arrival of new passengers, and the abundant responsibilities created time constraints for the senior stewards. Even the NCL supervisors who evaluated the senior stewards' work recognized these constraints, with one supervisor noting that with the Freestyle "concept we also advertise relax[ing] debark[ation] which put[s] another stress" on embarkation day. *See* D.E. 366–54 at 3.

NCL insists that the plaintiffs overstate the time constraints, for every senior steward worked alongside a junior steward. The parties disagree, however, about the junior stewards' responsibilities. NCL posits that the senior stewards and the junior stewards worked as a team. And this team could finish the work in the available time. But the plaintiffs testified that the junior stewards offered little or no

help. The evidence bears out the plaintiffs' position.

The plaintiffs consistently testified that junior stewards had only two responsibilities: to clean the bathrooms and balconies. The junior stewards thus offered no help with the rest of the cabins. *See* D.E. 369 at 197–98; D.E. 371 at 40. 65. 71, 99. To be sure, NCL offered some testimony by its employees that all junior stewards and senior stewards should have worked in teams to clean the cabins, and it appears that a few junior stewards willingly helped their senior stewards. For example, Caesar Lanic, a senior stateroom steward, testified that his junior steward helped him clean the cabins. *See* D.E. 372 at 68.

Yet the preponderance of the evidence supports the plaintiffs' testimony, i.e., that the junior stewards, with rare exception, refused to help clean the cabins. This conclusion is supported not only by the plaintiffs' testimony, which I find credible on this point, but also by e-mails and other documents.

For instance, in one e-mail to NCL's hotel-operations director, an NCL executive housekeeper wrote that the junior stateroom stewards didn't "take the initiative to help the [senior] steward because of the salary difference." *See* D.E. 366–49 at 2. For that reason, the executive housekeeper advocated that NCL increase the junior stewards' responsibilities. *See id.* Similarly, the junior-steward job description noted one primary duty on embarkation days—to sanitize bathrooms—and did not state that junior stewards must help strip or make beds, clean coffee pots, or vacuum. *See* D.E. 366–64 at 4.[2]

So NCL's senior stewards had a mammoth workload in a period shortened by passengers' mellow disembarkation, and that workload was made more difficult be-

---

**2.** The job description does state, however, that junior stewards must help with the trash.

cause the junior stewards offered no real help. If they failed to finish their work or rushed their work, moreover, senior stewards faced NCL's quality-control process—someone would randomly check some of the rooms that they cleaned—which could lead to verbal and written reprimands. See D.E. 369 at 230–31; D.E. 371 at 59; D.E. 366–62 at 1. Under these circumstances, I find that senior stewards had to hire helpers to complete their cleaning duties on embarkation day.

NCL, of course, disputes this. According to NCL, the plaintiffs elected to hire helpers. A slew of witnesses testified for NCL on this issue, but it is quality rather than quantity that matters. On this issue. I find the testimony of the NCL witnesses lacking.

Take for instance Cesar Hapa, an executive housekeeper at NCL. He testified that senior stewards could finish their work on time without help. See D.E. 372 at 133–34. Mr. Hapa. however, articulated his bias in this case when he blamed nationality for the plaintiffs' inability to finish their work on time. See id. at 14144.[3] Or take Michelle Dognon–Bertino, a former NCL hotel-operations director. She too testified that senior stewards could finish their work without helpers. See D.E. 366–105 at 40. Yet, like Mr. Hapa, Mrs. Dognon–Bertino lacks credibility. She initially signed a sworn statement that said the opposite, namely, that senior stewards needed helpers to finish their work. Then she made an about-face on nearly everything written in her sworn statement.

Her explanation for the 180–degree turn was flimsy, and her about-faces were numerous, bordering on the myriad. See D.E. 366–105 at 46; 366–106 at 7.[4] Then there's Clyde Harbin, an NCL executive housekeeper who said that the senior stewards opted to hire helpers. But he also said that, despite now being aware of the helpers issue, he would do nothing about it. See D.E. 371 at 220. And Patrycja Kosla, a senior NCL housekeeping trainer, testified that she trained senior stewards and junior stewards to work together. See D.E. 373 at 3. Her fervor caused her to lake an antagonistic stance on every question posed by plaintiffs' counsel, however, which resulted in illogical responses, like her testimony that she would "voluntarily choose to give up 25 percent" of her salary. See id. at 27. On the helper issue, I do not find these witnesses' testimony persuasive.

NCL presented just two credible witnesses on this issue. Mr. Lanic and Ronald Alcaraz testified that they could clean all the assigned cabins without helpers. See D.E. 372 at 66, 103. Yet Mr. Lanic and Mr. Alcaraz had junior stewards who helped them. See id. at 68, 103. Their testimony was believable, but I find that Mr. Lanic and Mr. Alcaraz are outliers, standard deviations away from the mean. As I have noted, with few exceptions, the junior stewards refused to help the senior stewards, for their job descriptions did not require them to do so and NCL paid senior stewards more. And so I find that junior stewards helping senior stewards

---

3. The plaintiffs are Jamaican; Mr. Hapa is Filipino.

4. The following is a representative example. After Mrs. Dognon–Bertino recanted her statement, plaintiffs' counsel underscored that Mrs. Dognon–Bertino signed an acknowledgment that the sworn statement was "true and correct to the best of [her] knowledge and recollection." D.E. 366–105 at 46. Counsel asked Mrs. Dognon–Bertino if she had read that language in the sworn statement. Mrs. Dognon–Bertino agreed that she understood and signed the affirmation of the sworn statement's truthfulness but said that she did not find the language important because she "only thought [the sworn statement] was notes [that the plaintiffs' attorney was] going to use." Id. She never explained why that mattered.

was a rare occurrence during the relevant period.

Besides, Mr. Lanic and Mr. Alcaraz admitted that they too hired helpers sometimes. Although they testified that they did so voluntarily, I do not find that explanation completely credible. *See* D.E. 372 at 66, 101. For instance, on direct examination, Mr. Alcaraz answered the question whether he needed to hire helpers to finish his job with a "[s]ometimes, sir, I did, sometimes I did not." *See id.* at 101. Coupled with the plaintiffs' testimony, this evidence suggests to me that Mr. Lanic and Mr. Alcaraz hired helpers more out of necessity than convenience.

The plaintiffs, moreover, did not behave as if they opted to pay for helpers. The housekeeping department on the ships had weekly meetings, and most witnesses (not just the plaintiffs) stated that, at these meetings, senior stewards griped about their having to hire helpers. *See* D.E. 366–105 at 39; D.E. 369 at 209; D.E. 371 at 31, 60, 83, 108, 135.

Some witnesses testified that the senior stewards did not complain. The paper record, however, indicates that NCL's senior stewards complained about the helper situation. One voyage report notes that senior stewards complained about the need for helpers on embarkation day. *See* D.E. 366–37 at 2. In a number of e-mails, NCL employees mentioned that the senior stewards needed to hire helpers. *See* D.E. 366–33 at 3; D.E. 366–34 at 4. One senior steward wanted a demotion to the junior-steward position because as a junior steward she would not have to pay for helpers. Therefore, she would make more money as a junior steward despite the salary difference. *See* D.E. 366–55 at 13.

The record also supports the notion that the plaintiffs *had* to hire helpers to finish their work on a timely basis. In one e-mail, Mrs. Dognon–Bertino wrote that, because they had not hired helpers, the sen-

ior stewards "were a bit negligent with their staterooms yesterday." *See* D.E. 366–48 at 1. Yet another e-mail notes that all senior stewards hire helpers except for the lucky senior stewards who have helpers assigned to them (and paid for) by NCL. *See* D.E. 366–28 at 5. These documents, along with the testimony at trial, establish that the senior stewards *needed* to hire helpers to complete the work assigned to them on embarkation day by NCL.

## II. CONCLUSIONS OF LAW

### A. JURISDICTION

Because the Seaman's Wage Act is a federal enactment, jurisdiction exists under 28 U.S.C. § 1331, which gives district courts jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." There is also jurisdiction under 28 U.S.C. § 1333 because this is a "civil case of admiralty or maritime jurisdiction."

### B. THE SEAMAN'S WAGE ACT CLAIM

Seamen are, of course, entitled to their wages. The relevant portion of the Seaman's Wage Act governs when a shipowner must pay those wages: "At the end of a voyage, the master shall pay each seaman the balance of wages due the seaman within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier." 46 U.S.C. § 10313(f). Where a shipowner withholds a seafarer's wages and lacks "sufficient cause" for withholding the wages, "the master or owner shall pay to the seaman 2 days' wages for each day payment is delayed." § 10313(g).

■ "[C]ongressional legislation in aid of seamen ... is largely remedial and calls for liberal interpretation in favor of seamen." *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 782, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952). I have already ruled that NCL

would have violated the Seaman's Wage Act if it had "an unwritten policy of refusing to allow the plaintiffs to keep their full wages, such that NCL de facto refused to pay full wages." *See* Summ. J. Order, D.E. 222 at 9. I now conclude that, during the relevant claim period, NCL created a situation where it was nearly impossible for the plaintiffs to clean all their assigned cabins. Hence, NCL owes the plaintiffs the money that they used to pay helpers in order to timely complete their work.

As I have already discussed, passengers left late under NCL's Freestyle cruise policy. Senior stewards could not start to clean most of the cabins until after 9:30 a.m. or so. Each cabin had a slew of responsibilities: the senior steward had to strip the beds, make the beds, vacuum the cabin, dust the cabin, sanitize areas of the cabin, wash the coffee pot. separate any garbage, and take out the trash. The senior stewards had to do this for 30 to 35 cabins, with a total of about 70 beds. And they had to do it without the help of junior stewards, who had no responsibility to help the senior stewards vacuum or clean the cabin or strip or make the beds. All this the senior stewards had to do in about 4.5 hours. I thus find that NCL essentially forced the plaintiffs to hire helpers in order to complete their work on a timely basis. I find, as well, that the plaintiffs are entitled to the wages they spent paying for help. Just as it would be impermissible for NCL to deduct the helpers' pay from the plaintiffs' paychecks, *see Isbrandtsen,* 343 U.S. at 781–89, 72 S.Ct. 1011, it was a violation of the Seaman's Wage Act for NCL to assign the plaintiffs a quantum of work that could not be completed without the plaintiffs using some of their wages to pay for helpers. In practice, NCL's actions constituted a withholding of wages under the Act.

The plaintiffs also seek penalty wages under the Seaman's Wage Act. Courts may award penalty wages where (1) a shipowner does not pay a seafarer his wages "within 24 hours after the cargo has been discharged or within 4 days after the seaman is discharged, whichever is earlier," and (2) the shipowner refused to pay "without sufficient cause." § 10313(f)-(g). The penalty wages. amount to "2 days' wages for each day payment is delayed." § 10313(g). As the plaintiffs have shown that NCL withheld wages by forcing them to hire helpers, it is NCL's burden to show that its actions were with "sufficient cause." *See, e.g., Arguelles v. U.S. Bulk Carriers,* 408 F.2d 1065, 1070 (4th Cir.1969) (analyzing 46 U.S.C. § 56, the predecessor of § 10313(g)); *Chretien v. Exxon Co., U.S.A.,* 701 F.Supp. 266, 270 (D.N.H.) (same), *aff'd,* 863 F.2d 182 (1st Cir.1988); *Smith v. W. Offshore, Inc.,* 590 F.Supp. 670, 676 (E.D.La.1984) (same). I conclude that NCL has satisfied its burden to show its actions do not demand penalty wages.

A "wrongful withholding alone does not establish the absence of sufficient cause." *Vinieris v. Byzantine Maritime Corp.,* 731 F.2d 1061, 1063 (2d Cir.1984). A shipowner withholds wages without sufficient cause if it is not only contrary to law but also "arbitrary, wilful or unreasonable." *Chretien,* 863 F.2d at 184 (quoting *McCrea v. United States,* 294 U.S. 23, 30, 55 S.Ct. 291, 79 L.Ed. 735 (1935)). Courts have explained that the penalty wages do not apply where the shipowner had a reasonable belief that the wages were not due, where the shipowner committed an error of judgment, or where there was a dispute as to the wages owed. *See Byzantine,* 731 F.2d at 1063–64. Here, it seems to me that there was a genuine dispute about whether wages were owed. In addition, NCL had a reasonable belief that the seafarer's wages were not withheld. For these reasons. I do not award the plaintiffs penalty wages. *See Alier v. Sea Land Serv.,* 465

F.Supp. 1106, 1114 (D.P.R.1979) ("[W]here the refusal or failure to pay wages results from ... a dispute about which honest men are apt to differ, the courts are loathe to declare a penalty when later one of the parties to the controversy has been proved wrong ....").

First, NCL had a reasonable belief that the plaintiffs' wages were not due. NCL technically did pay the plaintiffs' wages, even though it created a situation where the plaintiffs had to use some of that money to do their jobs. I've previously held that "allowing such [sleight] of hand would eviscerate the purpose of the Seaman's Wage Act," *see* Summ. J. Order, D.E. 222 at 9, and adhere to that holding (as explained earlier) to rule that NCL's policy violated the Seaman's Wage Act. But the plaintiffs' theory is nonetheless novel, and I have not found a single published (or unpublished) opinion in which a court held that a shipowner withheld a seafarer's wages in violation of the Seaman's Wage Act when the seafarer had to pay others to complete their work on time.

Second, some senior stewards, like Mr. Lanic and Mr. Alcaraz, informed NCL that junior stewards did help senior stewards clean cabins. Because NCL technically paid the plaintiffs' wages and since some senior stewards told NCL that junior stewards helped clean cabins, I cannot say that NCL acted arbitrarily or willfully or unreasonably.

I therefore award the plaintiffs that money which they had to spend to hire helpers in order to complete their work, as well as prejudgment interest. I do not award them penalty wages.

### C. DUTY OF GOOD FAITH AND FAIR DEALING

■ The collective bargaining agreement and the employment contracts re-quired NCL to pay the plaintiffs $2,796 per month. NCL did not keep its end of the bargain, the plaintiffs insist, because it forced the plaintiffs to hire helpers to finish their work and to pay those helpers from their monthly wages. NCL's actions, according to the plaintiffs, violated the duty of good faith and fair dealing immanent in every contract. I agree.

■ The first question is what law applies to interpreting the employment contracts. In this case, I have federal admiralty jurisdiction, so, presumably, admiralty choice-of-law principles apply. In cases concerning maritime contracts, the Eleventh Circuit asks which "sovereign entity has the most significant relationship with the transaction at issue." *Dresdner Bank AG v. M/V Olympia Voyager,* 446 F.3d 1377, 1382 (11th Cir. 2006) (per curiam). This analysis is complicated by the collective bargaining agreement, which states that Bahamian law applies to all disputes arising under the collective bargaining agreement. *See* D.E. 366–2 at 31. Fortunately, I need not undertake the choice-of-law analysis, for the parties have waived any choice-of-law issue, both apparently agreeing that Florida law applies. *See Int'l Ins. v. Johns,* 874 F.2d 1447, 1458 n. 19 (11th Cir.1989) (noting that federal courts apply substantive law of forum in diversity case when parties do not consider or address choice-of-law question); *Whirlpool Fin. Corp. v. Sevaux,* 96 F.3d 216, 221 (7th Cir.1996) ("We agree ... that Mr. Sevaux waived any objection to the application of Illinois law by failing to address the choice-of-law issue earlier in the proceedings.").[5] I therefore apply Florida law, which both parties cite, to this issue.

---

5. The plaintiffs and NCL cited Florida law on this issue at the summary judgment stage. They undertook no choice-of-law analysis whatsoever and gave no warning about the application of foreign law under Federal Rule of Civil Procedure 44.1.

 Florida law imposes a duty of good faith and fair dealing on parties to a contract. Through implication, each party to a contract "promises to perform" his "part of the bargain in good faith" and "expects the other party to do the same." *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1097 (Fla.Dist.Ct.App.1999). This promise applies "when a question is not resolved by the terms of the contract or when one party has the power to make a discretionary decision without defined standards." *Publix Super Mkts. v. Wilder Corp. of Del.*, 876 So.2d 652, 654 (Fla.Dist. Ct.App.2004). "[W]here the terms of the contract afford a party substantial discretion to promote the party's self-interest, the duty to act in good faith nevertheless limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party." *Cox*, 732 So.2d at 1097–98. For the reasons stated below, I conclude that under Florida law NCL violated the duty of good faith and fair dealing.

The plaintiffs' employment contracts all incorporated the collective bargaining agreement between NCL and the Norwegian Seafarers' Union. *See* D.E. 366–90; D.E. 366–91; D.E. 366–92; D.E. 366–93; D.E. 366–94; D.E. 366–95. The collective bargaining agreement created a pay scale for different sorts of employees. Under the pay scale, NCL was to pay the plaintiffs (who were senior stewards) $2,796 every month. The collective bargaining agreement stated that "[e]ach full month the Seafarer is on board, he shall be entitled to payment of one hundred ... percent of the Seafarer's Wages after approved deductions have been made." D.E. 366–2 at 4. The plaintiffs' payment to "helpers," as explained above, did not constitute an approved deduction.

NCL, as the employer, had the discretion of defining the senior stewards' embarkation-day tasks. And, as the shipown-er, NCL could decide when passengers had to disembark and when new passengers could board. NCL also defined the junior stewards' tasks on embarkation day. NCL thus had wide latitude in deciding how much work, how much time, and how much help the senior stewards had on embarkation day, NCL had wide discretion, furthermore, in disciplining senior stewards who did not finish their work. In similar situations—i.e., where one party to a contract uses its discretion to make it difficult for the other party to the contract to fulfill his contractual obligations—Florida courts have found that there can be a breach of the duty of good faith and fair dealing. *See Cox*, 732 So.2d at 1098 ("[T]he written contracts between CSXI and appellants are silent with regard to the methodology or standards to be used by CSXI in exercising its discretion to assign loads for transport. The record reflects that an owner/operator of a vehicle who contracts with CSXI exclusively would be unable to meet the costs of operation if assigned to transport only low-paying, short-distance shipments and that CSXI repeatedly failed to assign long-haul, more lucrative loads to appellants. Thus, while the appellants have no right under the contracts to use any particular method of assignment, issues of fact exist as to whether the manner by which CSXI exercised its discretion in assigning freight to appellants violated the implied duty of good faith, fair dealing and commercial reasonableness."); *Gulf Am. Land Corp. v. Wain*, 166 So.2d 763, 764 (Fla.Dist.Ct.App. 1964) ("The main thrust of the appellee's complaint was that appellant had failed, neglected, and refused to furnish him information which would permit him to discharge his duties under the contract. The appellant does, in our view, come within the rule that when a person contracts for the doing of a certain thing with another, he impliedly promises that he will not him-

self do anything to hinder or obstruct the performance by the other person.").

Simply put, the plaintiffs could not have expected that their jobs would require them to hire, out of pocket, other employees so as to complete their work. Under Florida law, then, NCL breached its duty of good faith and fair dealing.

The measure of damages for that breach is the same as under the Seaman's Wage Act—the sums that the plaintiffs had to pay out for helpers to complete their work on time. *See, e.g., Univ. Cmty. Hosp. v. Wilson*, 1 So.3d 206, 214 (Fla.Dist.Ct.App. 2008); *Amjad Munim, M.D., P.A. v. Azar*, 648 So.2d 145, 149–50 (Fla.Dist.Ct.App. 1994). This is because "the purpose of an award of damages in a breach of contract action is to place the injured party in the same financial position as he would have occupied if the contract had been fully performed." *Zayre Corp. v. Creech*, 497 So.2d 706, 707 (Fla.Dist.Ct.App.1986).

### D. NCL's AFFIRMATIVE DEFENSE

█ NCL believes that, even if it made it impossible for the plaintiffs to complete their work, it is not liable. According to NCL, the plaintiffs used helpers throughout their employment. Despite the knowledge that they'd have to hire helpers, the plaintiffs regularly reenlisted to work as senior stewards for NCL. Florida law, NCL contends, recognizes that parties may amend an agreement through their conduct. *See, e.g., Beach Higher Power Corp. v. Granados*, 717 So.2d 563, 565 (Fla.Dist.Ct.App.1998) ("The law has clearly been established that a written contract may be modified by ... subsequent conduct of the parties...."). Although I agree with NCL that the plaintiffs continued to reenlist with NCL despite the knowledge that they would have to hire helpers, I disagree that this conduct modified the plaintiffs' employment contracts.

█ NCL's argument has a critical flaw. For a party's course of conduct to modify a written agreement, the party must act without objection. That is, "[a]ny subsequent modification requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities are sought to be affected by the modification." *Dows v. Nike, Inc.*, 846 So.2d 595, 603 (Fla.Dist.Ct.App.2003). *See also Tropicana Pools, Inc. v. Boysen*, 296 So.2d 104, 108 (Fla.Dist.Ct.App.1974) ("It is 'hornbook law' requiring no citations of authority, except common sense, that a contract ... may not thereafter by unilaterally modified; subsequent modifications require consent...."); 11 FLA. JUR. 2D CONTRACTS § 212 (2007) ("The basic requirements for modification of a contract are a subsequent agreement or a subsequent course of conduct evidencing a modification.... All parties to the contract must assent to its modification."). The evidence here shows that the plaintiffs did not assent to the modification. To the contrary, the plaintiffs clamored at their housekeeping meetings about having to pay for helpers. *See* D.H. 366–105 at 39; D.E. 369 at 209; D.E. 371 at 31, 60, 83, 108, 135, Because the plaintiffs never consented to paying helpers, they did not modify their employment contracts with NCL through their course of conduct.

### III. DAMAGES

The question then becomes how many helpers the plaintiffs needed. The plaintiffs all testified that they had to hire two helpers and that they paid those helpers $75 each. [D.E. 369 at 207]. I agree that the plaintiffs had to pay each helper $75 and that the plaintiffs had to hire two helpers.

As I've already found, the plaintiffs had from around 9:30 a.m. to 2:00 p.m. to clean 30 to 35 cabins containing 70 beds. That's about 4.5 hours to change the sheets and

linens of 70 beds.[6] At trial, the witnesses gave conflicting reports about how long it takes a senior steward to remove the beds' sheets and linens, separate those linens, and to make the bed anew. NCL's witnesses testified that it took somewhere between five and six minutes. *See* D.E. 372 at 66, 125. The plaintiffs underscored that the beds had to be pristine and immaculate and testified that it took them between eight and ten minutes to strip the beds, separate the linens, and make the bed. *See* D.E. 371 at 72, 138. Mr. Wallace, however, testified that it took him about six to seven minutes to do this. *See* D.E. 369 at 214. After considering all this testimony, I conclude that it took seven minutes, on average, for a steward to make a bed.

If a senior steward takes seven minutes to strip and make each bed, and his task asks that he strip and make 70 beds, arithmetic tells us that it would take a senior steward 490 minutes to finish the task. And 490 minutes, of course, is eight hours and ten minutes. But the plaintiffs had 4.5 hours to do all his work. Thus, each plaintiff needed another person to, at least, put in 3.6667 hours (3 hours and 40 minutes) to make the beds.

That's not all, though. The plaintiffs also had to vacuum the cabins and the halls, dust the cabins, sanitize areas of the cabins, wash the coffee pots, separate any garbage, and take out the trash. These events had to be done 30 to 35 times on embarkation day. And the plaintiffs had to do this work piecemeal because the passengers on the cruise ships left not as a whole but bit by bit. So the plaintiffs had to clean whichever room was available for cleaning when it was available. This makes focus on one task (like vacuuming all rooms in one sweep) almost impossible.

The helpers, moreover, are not senior stateroom stewards, so they lack the experience in making bed. At most, one helper only has 50 minutes to spare, assuming the helper can also make a bed in the seven minutes it takes an experienced senior steward to make a bed. That's likely an improper assumption. Given the helper's inexperience in making beds and the other tasks to be completed, the plaintiffs had to hire another helper. Each embarkation day, then, the plaintiffs needed to hire two helpers.

Finally, the evidence shows that Mr. Wallace had 96 embarkation days on which he worked within the relevant claim period, as did Mr. Nash. *See* D.E. 366–84; D.E. 366–85. Mr. Palmer had 91 embarkation days, and Mr. Barrant had 63. *See* D.E. 366–86; D.E. 366–87. For her part, Ms. Haughton had 98 embarkation days. *See* D.E. 366–88. And Mr. James had, in the relevant period, 41 embarkation days on which he worked. *See* D.E. 366–89. When multiplied by the amount of money the plaintiffs had to spend on helpers (2 helpers times $75 per helper, which equals $150 per embarkation day), this amounts to $14,400 in damages for Mr. Wallace; to $14,400 in damages for Mr. Nash; to $13,600.50 in damages to Mr. Palmer; to $9,450.50 in damages to Mr. Barrant; to $14,700 in damages for Ms. Haughton; and to $6,150 in damages to Mr. James.

## IV. Prejudgment Interest

The plaintiffs also merit prejudgment interest. After all, had NCL paid them their full wages from the start, the plaintiffs could have saved that money and earned interest. *See St. Paul Fire & Marine Ins. v. Lago Canyon, Inc.*, 561 F.3d 1181, 1191–92 (11th Cir.2009) ("As a general rule, pre-judgment interest should be awarded in admiralty cases. Pre-judg-

---

6. I say "about 4.5 hours" because passengers were trickling out before 9:30 a.m. I do not have enough data, however, to create a pre-

cise mathematical model on this issue, and so I use this approximation instead.

ment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his."); *Int'l Paint Co. v. M/V Mission Viking*, 637 F.2d 382, 386 (5th Cir. Unit B 1981) (reversing district court for not awarding prejudgment interest on crew's wages claim); *First Bank & Trust v. Knachel*, 999 F.2d 107, 108–09 (5th Cir.1993) (noting prejudgment interest allowed in admiralty wages case).

Unfortunately, it is not clear to me what interest rate applies, for there is some tension among Eleventh Circuit precedent. *Compare Sunderland Marine Mut. Ins. v. Weeks Marine Constr. Co.*, 338 F.3d 1276, 1280 (11th Cir.2003) (per curiam) ("The rate of pre-judgment interest that should be awarded is the prime rate during the relevant period."), *with Kilpatrick Marine Piling v. Fireman's Fund Ins.*, 795 F.2d 940, 947 (11th Cir.1986) ("Appellant . . . concedes that admiralty courts have discretion in deciding prejudgment interest."). *See also Werner Enters. v. Westwind Maritime Int'l*, 554 F.3d 1319, 1329 n. 10 (11th Cir.2009) ("In *Sunderland* . . . . we held . . . that the rate of prejudgment interest that should be awarded is the prime rate during the relevant period. As evidenced by the pre-*Sunderland* case cited in the text, and other binding pre-*Sunderland* cases, district courts have long had discretion in this Circuit to set the rate of prejudgment interest in both maritime and non-maritime contexts . . . . [W]e need not address the binding effect of *Sunderland* . . . ."). Accordingly, by noon on September 21, 2012, the plaintiffs and NCL are to simultaneously file supplemental briefs, not to exceed 10 pages, that explain (1) what prejudgment interest rate I should apply here, and (2) what the prejudgment interest comes out to for each of the plaintiffs, given their damages.

## V. CONCLUSION

For these reasons, the plaintiffs prevail on their Seaman's Wage Act claims, except with regard to penalty wages and on their claims for breach of the duly of good faith and fair dealing. A final judgment will be issued separately after the parties have submitted the memoranda on prejudgment interest.